IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEMETRIS McKINLEY, **Plaintiff,** v. BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, and ALEXANDER GUYAN, individually, **Defendants.** | Case No.: 1:22-CV-00251 **Trial by Jury Demanded** Judge Sharon Johnson Coleman Magistrate Judge Jeffrey Cole |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, DEMETRIS McKINLEY, by and through her attorneys, Case + Sedey, LLC, for her First Amended Complaint at Law against Defendants, BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, and ALEXANDER GUYAN, individually, and states and alleges as follows:

### Introduction

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended ("Title VII"), the Illinois Human Rights Act, 775 ILCS § 5/1-101 et seq. ("IHRA"), the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"), the Family & Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., as amended ("FMLA"), and Illinois common law.

2. Jurisdiction is conferred on this Court by the above-named statutes, as well as by 28 U.S.C. § 1331 and § 1367. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 (b) and (c).

1

**The Parties**

3. Plaintiff Demetris McKinley ("Plaintiff"), is a citizen of the United States and a resident of Chicago, Cook County, Illinois. Plaintiff's race is Black. Plaintiff is, and has at all relevant times been, employed by Defendant Board of Trustees of the University of Illinois and is an "employee" as defined by the aforementioned statutes.

4. Defendant Board of Trustees of the University of Illinois ("Defendant University") is an Illinois body corporate and politic and the governing body for the University of Illinois Hospital & Health Sciences System ("UHHSS"). Defendant University is, and has at all relevant times been, a covered entity as defined by the afore-mentioned statutes.

5. Defendant Alexander Guyan ("Defendant Guyan"), is a citizen of the United States and a resident of Chicago, Cook County, Illinois. Defendant Guyan's race is Hispanic.

**Factual Allegations**

6. Plaintiff began working for Defendant University in or around 1996 as a Clerk II at UHHSS, which was then known as the University of Illinois Medical Center.

7. During her twenty-five year career at UHHSS, Plaintiff has consistently met and/or exceeded Defendant University's performance expectations.

8. In or around 2015, Plaintiff was promoted to Assistant Director in UHHSS's Outpatient Surgery Clinic, reporting to Director Maggie Bontemps (Black). Prior to actually starting in the role, Plaintiff's title was reclassified to Administrative Aide, but she maintained the responsibilities of Assistant Director, which included (without limitation) providing support for operations, budgeting, purchasing, implementing and enforcing clinic policy, assisting with time and clockwork, monitoring attendance, scheduling, and supervision of Medical Assistants.

2

9. Plaintiff had a good relationship with Ms. Bontemps and received consistently favorable reviews and performance feedback.

10. On or around February 28, 2020, Ms. Bontemps retired, and she was replaced in the Director position by Defendant Guyan.

11. Despite Plaintiff's history of positive performance in the clinic, Defendant Guyan was immediately dismissive of her contributions. He would talk over her, dismiss her comments, and become agitated and aggressive in his interactions with her. He often claimed that she did not understand something he was talking about. Plaintiff never saw Defendant Guyan interact with her non-Black coworkers in this dismissive and aggressive manner.

12. In early March of 2020, Plaintiff asked Defendant Guyan for permission to work remotely. UHHSS had been encouraging employees who were able to perform their jobs remotely to do so given rising COVID-19 numbers. Further, Plaintiff's husband was undergoing treatment for colon cancer at the time and Plaintiff was concerned about potentially contracting the virus at work and bringing it home to him in his weakened state.

13. Defendant Guyan agreed to allow Plaintiff to work from home, but he quickly became very critical of her performance via email. Ultimately, just two weeks after Plaintiff began working remotely, he demanded that she return to working in person in the clinic.

14. Plaintiff's husband's medical condition was deteriorating at that time, and she needed to be home with him to assist in his care. As a result, in early April 2020, Plaintiff applied for leave under the FMLA. Defendant University approved her request, and she began that leave on April 12, 2020.

15. Sadly, Plaintiff's husband passed away during the summer of 2020. She was devastated by the loss but had no more FMLA leave available to her. Thus, she returned to work on August 27, 2020.

16. On Plaintiff's first day back, Defendant Guyan criticized her for leaving him and one of her white coworkers "high and dry." He complained that they had had to figure everything out for themselves while Plaintiff was out on protected leave.

17. That same day, Defendant Guyan instructed Plaintiff that she was no longer allowed to work out of the same office as him. Plaintiff had shared an office with the clinic Director for the previous six years, but Defendant Guyan claimed that they could no longer do so due to COVID-19 related social distancing requirements.

18. Despite that claim, Defendant Guyan allowed non-Black employees to use Plaintiff's desk in his shared office throughout Plaintiff's FMLA leave and continues to do so to this day.

19. Shortly after Plaintiff returned from leave, two of her Black colleagues disclosed to her that they felt a "racial divide" in the clinic under Defendant Guyan's leadership. At that time, Defendant Guyan oversaw approximately seventeen employees – of which 5 were Black, 9 were Hispanic, and 3 were white.

20. Plaintiff's colleagues told her that they had witnessed Defendant Guyan give his white and Hispanic subordinates special treatment (for example, allowing the clinic's Hispanic employees to hold birthday parties in the break room while the clinic's Black employees continued to work covering the clinic floor) while subjecting his Black subordinates to hostility and bullying.

21. Further two of Plaintiff's Black coworkers left the clinic during her leave and told her that they decided to do so in part because of Defendant Guyan's hostility toward them.

22. Plaintiff experienced this divide firsthand when, in or around September of 2020, Defendant Guyan told two Hispanic Medical Assistants that they should not accept work assignments from Plaintiff (despite that clerical duties of the type Plaintiff had assigned were part of the Medical Assistants' job description). One of those Medical Assistants told Plaintiff that she was afraid to even talk to Plaintiff because every time Defendant Guyan saw her doing so, he gave her "dirty and angry looks."

23. Additionally, Defendant Guyan began assigning Plaintiff tasks which fell within his own responsibilities. For example, he would regularly ask her to handle accruals and modifications of physician schedules – despite that those tasks require the approval of an Administrator (a qualification which Plaintiff does not hold).

24. As a result of Plaintiff's inability to assign work to her subordinates and the additional work Defendant Guyan assigned to her, her workload quickly became overwhelming. She was regularly the last employee to leave the clinic for the day and was working far more hours than her non-Black counterparts.

25. On or around September 10, 2020, Plaintiff spoke with Defendant Guyan about this disparity and asked him to distribute the clinic's administrative workload more equitably. Defendant Guyan responded angrily, refusing to allow her to assign work to the Medical Assistants and raising his voice toward her so much that she felt the need to leave his office to de-escalate the situation.

26. Approximately thirty minutes later, Defendant Guyan called a huddle during which he told Plaintiff and several of her coworkers that "sometimes you have to catch a hold of yourself when you feel yourself getting a bit out of control." He went on to explain that someone had been in his office that day and he "thought [he] was going to have to go off on that person."

27. On another occasion, Defendant Guyan had told one of Plaintiff's coworkers that he "want[ed] to shoot" someone who had frustrated him in the workplace. Thus, Plaintiff was intimidated by his suggestion that he had almost "gone off" on her earlier that day.

28. On or around September 25, 2020, Defendant Guyan's hostility toward Plaintiff became more severe. That day, he loudly berated Plaintiff for failing to take the mail down to the mailboxes, despite that it was the Customer Service Associates' responsibility to do so. When Plaintiff tried to explain that she had been in the back office working on her Administrative tasks all day and that the Customer Service Associates still had time to take the mail down for the day, Defendant Guyan aggressively asked, "What did you say?" and started yelling that he needed to have a conversation with Plaintiff.

29. Plaintiff again felt the need to de-escalate the situation, so she walked away from the front desk where Defendant Guyan was making a scene. Defendant Guyan, however, followed Plaintiff through the clinic, all the while verbally attacking her in front of her peers and subordinates, including but not limited to loudly asking "Who do you think you are, lady?"

30. Plaintiff retreated to her office in the hopes that he would stop, but Defendant Guyan followed her to her office and stood in her doorway continuing to make disrespectful comments toward her.

31. Every time Plaintiff attempted to respond, he would talk over her and dismiss her again. At one point, Plaintiff stated that Defendant Guyan was not listening to her, and he yelled at her that "maybe [she] should go somewhere else and find someone who will." Plaintiff felt this was a threat to her job.

32. Plaintiff has witnessed several Hispanic employees in the clinic disagree with Defendant Guyan, engage in inappropriate workplace behavior, and/or object to Defendant

6

Guyan's conduct or comments towards them without him becoming aggressive or hostile in the manner he was treating Plaintiff.

33. After Defendant Guyan left her office on September 25, 2020, Plaintiff called UHHSS's Patient & Guest Experience Office to file a complaint. However, just as Patient Navigator Maurice Henderson answered, Defendant Guyan burst into her office and repeatedly screamed at her to "get off the phone."

34. When Plaintiff responded that she would not hang up, Defendant Guyan came into her office, stood over her, and swung his hand down on her phone, disconnecting the call. Plaintiff was terrified that Defendant Guyan would hit her as he did this, so she jumped back, and he narrowly missed her face. Plaintiff felt threatened and unsafe.

35. Mr. Henderson immediately returned Plaintiff's call, said he had heard the commotion, and asked her what was going on. Plaintiff responded, explaining Defendant Guyan's conduct towards her, and Mr. Henderson gave her the information she needed to file a formal complaint.

36. Plaintiff reported Defendant Guyan's conduct to the University Police later that evening. They told her that they could not arrest him because he had not physically touched her, but Plaintiff insisted that they take a formal report so that the incident was documented.

37. On or around September 28, 2020, Plaintiff reported Defendant Guyan's conduct to his supervisor, UHHSS's Ambulatory Assistant Director Nicole Rush.

38. In response, Ms. Rush asked for statements from two witnesses to the incident and asked Plaintiff to send her a copy of the police report. Plaintiff provided the requested information, and Ms. Rush scheduled a meeting with Plaintiff and Assistant Director of Employee Relations Aida Sanchez to further discuss the incident. During that meeting, Ms. Rush asked Plaintiff to

7

explain again what had transpired on September 25th and she indicated that they would investigate the incident and get back to Plaintiff. However, neither Ms. Rush nor Ms. Sanchez ever got back to her.

39. On October 19, 2020, Plaintiff emailed Ms. Rush again and this time copied UHHSS's Chief Ambulatory Officer Scott Jones and Ms. Sanchez. In these communications, Plaintiff explicitly stated that she felt she was being bullied, discriminated against, and retaliated against. She included examples of ways in which she was being treated differently than her non-Black counterparts. Plaintiff indicated that she did not feel safe and asked to be separated from Defendant Guyan.

40. Neither Ms. Rush, Ms. Sanchez, nor Mr. Jones responded to these communications. As a result, Plaintiff sent an email to what she believed was Defendant University's ethics office to initiate a complaint but never heard back.

41. In or around October of 2020, a colleague suggested that Plaintiff speak with Senior Director of Employee Services Lisa Caridine about her situation. Plaintiff met with Ms. Caridine who explained that Plaintiff had sent her ethics complaint to the wrong office. She provided Plaintiff with contact information for Defendant University's Office of Access and Equity ("OAE") and told her to report her concerns to that office.

42. Thus, in or around December of 2020, Plaintiff contacted the OAE and again reported Defendant Guyan's conduct. She relayed what happened on September 25th and also explained that she felt Defendant Guyan discriminated against her and other Black employees in the clinic based on their race.

43. After interviewing Plaintiff and taking her formal statement, the OAE told her that they were unable to investigate her situation as a discrimination complaint because the allegations

fell under Defendant University's "general bullying guidelines." OAE stated that they would have a conversation with Defendant Guyan, but that that was all they could do.

44. Defendant University has a documented zero tolerance policy for workplace violence, which is defined to include "any act or threat of physical violence, harassment, intimidation or other threatening disruptive behavior that occurs at the work site."

45. Further, Plaintiff knows of at least one Black clinic Director who was removed from her position by Defendant University after a white subordinate filed a complaint against her in relation to a verbal altercation in the workplace.

46. Thus, Plaintiff felt confident that Defendant University would similarly remove Defendant Guyan based on his documented and witnessed violation of the workplace violence policy.

47. However, none of the individuals to whom Plaintiff reported Defendant Guyan's threatening conduct took any action to remove Defendant Guyan from the clinic or to discipline him in any other way.

48. Thus, in or around November of 2020, Plaintiff contacted Ms. Caridine again and asked for her assistance. Ms. Caridine met with Plaintiff but refused to speak with her about Defendant Guyan's actions and, instead, asked Plaintiff if she needed to talk to someone in Employee Assistance to help her "deal with personal issues."

49. Plaintiff again told Ms. Caridine that she felt unsafe working with Defendant Guyan and asked if Defendant University would either remove Defendant Guyan from Plaintiff's work environment or transfer Plaintiff to another position. Ms. Caridine responded that she did not have the authority to do that and, instead, agreed that Plaintiff could just pull her door so that it was nearly closed, and Defendant Guyan would be unable to barge in as he previously had.

50. This solution did not actually protect Plaintiff from further harassment and, as a result, she continues to feel unsafe in her working environment to this day.

51. On January 6, 2021, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendant University had discriminated against her on the basis of her race and retaliated against her for engaging in protected activity.

52. Since that time, Defendant Guyan has continued to engage in a pattern and practice of race discrimination against Plaintiff and other Black employees in the clinic. Additionally, Defendant Guyan has engaged in an ongoing campaign of retaliation toward Plaintiff.

53. For example, Defendant Guyan has continued to behave aggressively in his interactions with Plaintiff, including in front of her subordinates, peers, and supervisor. As one example, in or around July of 2021, he belittled Plaintiff and attacked her character in a meeting held via Zoom at which Ms. Rush and a member of Defendant University's HR staff were present. No one counseled Defendant Guyan to behave respectfully or disciplined him in any way for his hostility.

54. Defendant Guyan has also repeatedly pulled Plaintiff away from her Administrative duties and instead assigned her to cover the clinic's front desk despite that there have been Hispanic Medical Assistants (whose job descriptions include covering the front desk) available to manage that task.

55. Further, in or around the fall of 2021, Defendant Guyan issued performance evaluations for every employee under his supervision except for Plaintiff. When Plaintiff reported this failure to her union, the union got Defendant University's HR department involved, and they directed Defendant Guyan to issue her a review. Defendant Guyan then issued Plaintiff the first

negative evaluation she had received in her 25 years of employment with Defendant University. Defendant Guyan supported this negative evaluation with false or unjustified criticisms.

56. In or around October of 2021, Defendant University assigned a new team of building service workers – all of whom were Black – to clean the clinic. Their first day in the clinic, Defendant Guyan (who had never met them before and knew nothing about them) instructed the clinic staff to put their belongings in a safe place because "the new housekeepers look like they will steal."

57. In or around December of 2021, Defendant Guyan interrupted Plaintiff during a conversation with two Medical Assistants and aggressively asked "what are you talking to them about," indicating that she should not be speaking with her coworkers. When Plaintiff attempted to respond, he continued to talk over her. Defendant Guyan was so aggressive toward Plaintiff that one of the Medical Assistants who witnessed the interaction asked her later that day what Defendant Guyan's "problem was" and indicated that she worried it would "be a repeat" of the September 25, 2020 incident.

58. In late February of 2022, Defendant Guyan loudly bragged to several Hispanic members of the clinic staff that he had "good news," that he had hired a new Medical Assistant, and that she was Puerto Rican.

59. Defendant Guyan also recently hired a non-Black individual with no relevant work experience to fill a senior level Customer Service Representative position rather than promoting a Black Customer Service Representative who has several years of experience in the clinic and offering the new hire her entry-level role.

60. When Plaintiff initially reported Defendant Guyan's misconduct, representatives in the OAE and HR departments told her that they did not have the authority to transfer Plaintiff to a

11

new department. Instead, they said that if she wanted to be removed from her office she would need to apply for positions in other departments, interview, and be hired.

61. Based on that advice, between October 2020 and December 2021, Plaintiff applied for approximately thirteen positions in other clinics or offices at UHHSS. Despite her stellar performance history and long-standing employment with Defendant University, she has not even been invited to interview for any of these roles.

### Administrative Prerequisites

62. Plaintiff filed her original EEOC charge against Defendant University (Charge No. 440-2021-00323C) alleging race discrimination and retaliation on January 6, 2021. That charge was cross-filed with the Illinois Department of Human Rights ("IDHR").

63. On June 25, 2021, Plaintiff filed a charge against Defendant Guyan, individually, at the IDHR (Charge No. 2021CN1738) alleging retaliation.

64. On November 12, 2021, Plaintiff received her Notice of Right to Sue from the EEOC.

65. On March 21, 2022, the IDHR dismissed Plaintiff's charge against Defendant Guyan and notified her of her right to file suit.

### COUNT I: TITLE VII RACE DISCRIMINATION AGAINST DEFENDANT UNIVERSITY

66. Plaintiff incorporates the preceding paragraphs 1-65 as though fully set forth in this Count I.

67. Defendant University intentionally discriminated against Plaintiff based on her race when it subjected her a continuing violation of disparate treatment as compared to her non-Black counterparts, harassment resulting in a racially hostile-working environment, and failures to transfer and/or promote her to positions for which she is qualified.

12

68. Defendant University engaged in the aforesaid discriminatory acts with malice or with reckless indifference to Plaintiff's federally protected rights under Title VII.

69. As a direct and proximate result, Plaintiff has suffered and continues to suffer substantial damages including but not limited to lost wages, lost benefits, emotional distress, and reputational harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A. Enter a finding that Defendant University subjected her to race discrimination in violation of Title VII;

B. Award her lost wages and benefits;

C. Award her compensatory and punitive damages in an amount to be proven at trial;

D. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award any further relief this Court deems to be just and appropriate.

### COUNT II: IHRA RACE DISCRIMINATION
### AGAINST DEFENDANT UNIVERSITY

70. Plaintiff incorporates the preceding paragraphs 1-65 as though fully set forth in this Count II.

71. Defendant University intentionally discriminated against Plaintiff based on her race when it subjected her a continuing violation of disparate treatment as compared to her non-Black counterparts, harassment resulting in a racially hostile-working environment, and failures to transfer and/or promote her to positions for which she is qualified.

72. Defendant University engaged in the aforesaid discriminatory acts with malice or with reckless indifference to Plaintiff's statutorily protected rights under the IHRA.

73. As a direct and proximate result, Plaintiff has suffered and continues to suffer substantial damages including but not limited to lost wages, lost benefits, emotional distress, and reputational harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A. Enter a finding that Defendant University subjected her to race discrimination in violation of the IHRA;

B. Award her lost wages and benefits;

C. Award her compensatory damages in an amount to be proven at trial;

D. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award any further relief this Court deems to be just and appropriate.

## COUNT III: SECTION 1981 RACE DISCRIMINATION
## AGAINST DEFENDANT UNIVERSITY

74. Plaintiff incorporates the preceding paragraphs 1-65 as though fully set forth in this Count III.

75. By failing to promote Plaintiff and subjecting her to harassment and disparate treatment as compared to her non-Black counterparts, Defendant University unlawfully interfered with Plaintiff's right to make and enforce her employment contract regardless of her race, in violation of Section 1981.

76. Defendant University engaged in the aforesaid discriminatory acts with malice or with reckless indifference to Plaintiff's federally protected rights under Section 1981.

77. As a direct and proximate result, Plaintiff has suffered and continues to suffer substantial damages including but not limited to lost wages, lost benefits, emotional distress, and reputational harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A. Enter a finding that Defendant University unlawfully interfered with her right to make and enforce her employment contract regardless of her race in violation of Section 1981;

B. Award her lost wages and benefits;

C. Award her compensatory and punitive damages in an amount to be proven at trial;

D. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award any further relief this Court deems to be just and appropriate.

### COUNT IV: TITLE VII RETALIATION
### AGAINST DEFENDANT UNIVERSITY

78. Plaintiff incorporates the preceding paragraphs 1-65 as though fully set forth in this Count IV.

79. Plaintiff exercised her rights under Title VII and engaged in protected activity when she made repeated internal complaints of disparate treatment and racially motivated harassment to Defendant University's leadership, including but not limited to Ms. Rush, Mr. Jones, Ms. Caridine, Ms. Sanchez, and to the Office of Access and Equity.

80. Plaintiff again exercised her rights under Title VII and engaged in protected activity when she filed a charge alleging race discrimination and retaliation with the EEOC.

81. Defendant University retaliated against Plaintiff as a result of her protected activity when they subjected her to materially adverse employment actions including continued disparate treatment as compared to her non-Black counterparts, harassment resulting in a racially hostile-working environment, and failures to transfer and/or promote her to positions for which she is qualified.

82. Defendant University knowingly and willfully engaged in this retaliatory conduct with malice or reckless indifference to Plaintiff's federally protected rights under Title VII.

83. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer substantial damages including but not limited to lost wages, lost benefits, emotional distress, and reputational harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court award her the following relief:

A. Enter a finding that Defendant University subjected her to retaliation in violation of Title VII;

B. Award her lost wages and benefits;

C. Award her compensatory and punitive damages in an amount to be proven at trial;

D. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award any further relief this Court deems to be just and appropriate.

### COUNT V: IHRA RETALIATION
### AGAINST ALL DEFENDANTS

84. Plaintiff incorporates by reference the preceding paragraphs 1-65 as though fully set forth in this Count V.

85. Plaintiff exercised her rights under the IHRA and engaged in protected activity when she made repeated internal complaints of disparate treatment and racially motivated harassment to Defendant University's leadership, including but not limited to Ms. Rush, Mr. Jones, Ms. Caridine, Ms. Sanchez, and to the Office of Access and Equity

86. Plaintiff again exercised her rights under the IHRA and engaged in protected activity when she filed charges at the IDHR alleging race discrimination against Defendant University and retaliation against both Defendants.

87. Defendants retaliated against Plaintiff as a result of her protected activity when they subjected her to materially adverse employment actions including continued disparate treatment

as compared to her non-Black counterparts, harassment resulting in a racially hostile-working environment, and failures to transfer and/or promote her to positions for which she is qualified.

88. Defendants knowingly and willfully engaged in this retaliatory conduct with malice or reckless indifference to Plaintiff's statutorily protected rights under the IHRA.

89. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer substantial damages including but not limited to lost wages, lost benefits, emotional distress, and reputational harm.

**WHEREFORE**, Plaintiff respectfully requests that the Court award her the following relief:

A. Enter a finding that Defendants subjected her to retaliation in violation of the IHRA;

B. Award her lost wages and benefits;

C. Award her compensatory damages in an amount to be proven at trial;

D. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award any further relief this Court deems to be just and appropriate.

## COUNT VI: FMLA DISCRIMINATION/RETALIATION AGAINST DEFENDANT UNIVERSITY

90. Plaintiff incorporates by reference paragraphs 1-65 as though fully set forth in this Count VI.

91. Plaintiff was an eligible employee as defined by the FMLA.

92. Plaintiff exercised her rights under the FMLA when she applied for and took FMLA-protected leave to assist in caring for her husband who was under treatment for colon cancer.

93. Defendant University knowingly, intentionally and willfully discriminated and/or retaliated against Plaintiff for exercising her rights under the FMLA when it subjected her to

ongoing harassment and bullying as compared to her counterparts who had not taken leave and failed to transfer and/or promote her to roles for which she was qualified.

94. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer substantial damages including but not limited to lost wages, lost benefits, emotional distress, and reputational harm.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant University discriminated and/or retaliated against her in violation of the FMLA;

B. Enter a finding that Defendant University engaged in the discrimination and/or retaliation intentionally and/or willfully;

C. Award her lost wages and benefits;

D. Award her liquidated damages;

E. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

F. Award any further relief this Court deems to be just and appropriate.

### COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT GUYAN

95. Plaintiff incorporates by reference paragraphs 1-65 as though fully set forth in this Count VII.

96. Defendant Guyan engaged in extreme and outrageous conduct toward Plaintiff when he loudly and publicly yelled at her, talked over her, berated her, followed her around the office, and when he barged into her office, stood over her, and slammed his hand down on her phone, narrowly missing her face.

97. Defendant Guyan intended to cause, or had a reckless disregard of the probability of causing, emotional distress to Plaintiff when he engaged in these actions.

98. As an actual and proximate cause of Defendant Guyan's actions, Plaintiff suffered severe and extreme emotional distress and damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant Guyan subjected her to the intentional infliction of emotional distress in violation of Illinois common law;

B. Award her compensatory and punitive damages in an amount to be proven at trial;

C. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

D. Award any further relief this Court deems to be just and appropriate.

## COUNT VIII: ASSAULT
## AGAINST DEFENDANT GUYAN

99. Plaintiff incorporates by reference paragraphs 1-65 as though fully set forth in this Count VIII.

100. Defendant Guyan engaged in an intentional act, directed toward Plaintiff, that caused her a reasonable apprehension of imminent offensive contact with her person when he barged into her office, stood over her, and slammed his hand down on her phone, narrowly missing her face.

101. Defendant Guyan had the apparent ability to engage in harmful or offensive contact with Plaintiff's body when he did so.

102. As an actual and proximate cause of Defendant Guyan's actions, Plaintiff suffered emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant Guyan assaulted her in violation of Illinois common law;

B. Award her compensatory and punitive damages in an amount to be proven at trial;

C. Award her reasonable attorneys' fees and costs incurred in bringing this action; and

D. Award any further relief this Court deems to be just and appropriate

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues herein.

                                              Respectfully Submitted,

                                              DEMETRIS McKINLEY

                                              By: /s/ *Kate Sedey*
                                                    One of Her Attorneys

Kate Sedey
Kristin M. Case
Case + Sedey, LLC
250 South Wacker Dr., Suite 230
Chicago, Illinois 60606
312-920-0400
312-920-0800 (fax)
ksedey@caseandsedey.com